IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

TIFFANY FLANNERY,              :

          Plaintiff,

     v.                       :       Case No. 3:18-cv-412

RIVERSIDE RESEARCH                 JUDGE WALTER H. RICE
INSTITUTE,

          Defendant.        :

_____

DECISION AND ENTRY SUSTAINING DEFENDANT RIVERSIDE
RESEARCH INSTITUTE'S MOTION FOR SUMMARY JUDGMENT
(DOC. #21) ON EQUAL PAY ACT CLAIM; DECLINING TO EXERCISE
SUPPLEMENTAL JURISDICTION OVER STATE LAW CLAIMS;
JUDGMENT TO ENTER IN FAVOR OF DEFENDANT AND AGAINST
PLAINTIFF; TERMINATION ENTRY

_____

Plaintiff, Tiffany Flannery, filed suit against her former employer, Riverside

Research Institute ("RRI"), alleging violations of the Equal Pay Act of 1963, 29

U.S.C. § 206(d)(1), and sex discrimination/constructive discharge in violation of

Ohio Revised Code §§ 4112.02 and 4112.99.

This matter is currently before the Court on Defendant RRI's Motion for

Summary Judgment, Doc. #21.  For the reasons set forth below, the Court

sustains RRI's motion on the Equal Pay Act claim and declines to exercise

supplemental jurisdiction over the state law claims.

## I.  Background and Procedural History

Riverside Research Institute ("RRI") is a government contractor involved in scientific research.  Employees hired to work at RRI are assigned a "humanic code," which is based, in part, on their education and job experience.  Doc. #31-5, PageID#737.  Compensation is based on a variety of factors.  *Id.* at PageID#741.  Using a salary "benchmark" system, RRI determines an appropriate pay range for each position, based on the duties of the job and degree of responsibility.  Where the employee falls within that pay range depends on his or her prior work experience, skills and educational background.  Annual salary merit increases are based on performance.  Doc. #29-4, PageID##634-35.

Plaintiff, Tiffany Flannery, began working at RRI in 2011 as an events coordinator, assisting with conferences and workshops, at an annual salary of $45,000.  She had no supervisory responsibilities in this role.  At that time, she had her GED and a Bachelor's degree in Psychology, but no Master's degree and no experience in government contracting.[1]

Several months after she was hired, Flannery expressed an interest in research to Mary Barefoot, RRI's Executive Director, and was promoted to a Technical Researcher.  RRI rejected Flannery's requests for a new starting salary of $75,000.  Her initial starting salary was $57,000, but this increased to $70,000 by December of 2012, based on her performance.  As a Technical Researcher,

---

[1]  Plaintiff obtained her Master's degree in Anatomy in 2017.

Flannery reported to Program Manager Terry Gnau, and assisted Dr. David Kapp with literature reviews and writing reports. She conducted research and attended conferences. Again, she had no supervisory responsibilities. In August of 2014, Flannery transferred to a new position and Ben Ausdenmoore was hired to fill her Technical Researcher position.

Flannery's new position was as a Project Lead (aka "Project Manager") on the nearly-completed EM-BAA contract. She continued reporting to Terry Gnau, the Program Manager on this contract. In this position, her salary increased to $80,000 and then $84,000. The EM-BAA contract was merged into the $40 million Research and Development in Antenna and Electromagnetic Technology ("RaDiAEM") contract.

Flannery continued working on the RaDiAEM contract as a Deputy Project Manager. RRI offered her a position with additional responsibilities, but she turned it down because it would have required work outside of normal business hours, and she wanted to spend that time with her family. Thereafter, John Taylor was hired as the Program Manager for the RaDiAEM contract. He was later replaced by David Snyder. Taylor and Snyder both had advanced degrees and years of experience managing large government contracts. Flannery, Taylor and Snyder all reported to Gnau. After Taylor was hired, Flannery worked for a while with Gnau on business development. In this position, she had no direct reports and was not assigned to any particular contract.

In November of 2016, Flannery became the Program Manager for Mission Systems Open Architecture Science and Technology ("MOAST"), a small government contract.[2] The first task order on the MOAST contract was valued at approximately $3.9 million. All future task orders were contingent on RRI's performance. Flannery's salary increased to $88,000. She was responsible for the daily operational activity on this contract. She acted as a liaison between project management and the project team, reviewed the status of projects and budgets, prepared status reports, resolved issues to meet productivity, quality and client satisfaction goals, and engaged in business development. In connection with the MOAST contract, Flannery supervised several employees and subcontractors.

In February of 2018, after RRI learned that the government had expressed concerns about RRI's performance on the MOAST contract, Gnau began having regular meetings with Flannery to resolve problems that had arisen. Because Flannery's team had failed to meet certain deadlines, the government reassigned some of the work to a competitor.

Around this same time, Godfrey Vassallo, the CEO of SiCore Technologies, Inc., another government contractor, approached Flannery about her interest in a position as a Program Manager at SiCore. However, he did not immediately offer her a job. In April of 2018, she told him that she anticipated that she could be available for employment with SiCore in June or July of that year.

---

[2] RRI maintains that Flannery's actual job title was Project Manager. *See* Doc. #29-4, PageID#635. This will be discussed in greater detail below.

4

On April 9, 2018, Flannery emailed Gnau and complained that she had not been paid the "market rate" ever since she began working at RRI as a Technical Researcher. At this time, however, she did not state that she was being paid less than her male counterparts. She also told Gnau that she had been offered a position with another company at a starting salary of $112,000. Flannery admits that this statement was completely false. Doc. #21-6, PageID#253. She nevertheless challenged Gnau to match the alleged "offer."

Gnau consulted with Elina Yakubov, RRI's Director of Human Resources, and reported back to Flannery that RRI could not match the offer, particularly given the problems with the MOAST contract. Undeterred, Flannery contacted RRI's CEO, Dr. Steven Omick, and threatened to leave if RRI would not match her alleged new job offer. Omick consulted with Gnau, who again determined that Flannery's request for a raise was unjustified. Gnau found that Flannery's salary correctly corresponded to her job duties and performance at RRI. Flannery then told Gnau that she never intended on accepting the other job offer and would be staying at RRI.

On May 24, 2018, Flannery emailed Yakubov, alleging for the first time that she was being paid less than her male colleagues. Doc. #21-6, PageID#313. Flannery and Yakubov met with Gnau. Gnau and Yakubov again determined that Flannery was being correctly and adequately compensated based on her job responsibilities, skill, education, and customer satisfaction.

5

In July of 2018, Flannery received a job offer from SiCore and resigned from RRI. After Flannery left RRI, Terry Gnau and then Mike Mattarock assumed her Program Manager responsibilities on the MOAST contract.

On December 18, 2018, Flannery filed suit against RRI, alleging violations of the Equal Pay Act, sex discrimination in violation of Ohio Revised Code § 4112.02, and constructive discharge. She alleges that Ben Ausdenmoore, John Taylor and David Snyder were paid more than she was for doing substantially similar work.[3]

Riverside has moved for summary judgment. It denies that Flannery's positions were "substantially similar" to those of Ben Ausdenmoore, John Taylor or David Snyder. It further argues that any pay differential is based on RRI's benchmark compensation system, and that these men were paid more than Flannery not because they are male, but because they have more education and more relevant experience, and had more responsibility than she did.

## II.   Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*

---

[3]   The salaries of Ausdenmoore, Taylor and Snyder have been disclosed to the Court in sealed documents, and the Court intends to protect the confidentiality of that information. It is undisputed that Flannery's salary was substantially less than theirs.

*v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute

about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). If it so chooses, however, the court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.    Analysis

The Court turns first to Flannery's claimed violations of the Equal Pay Act ("EPA"). She alleges that, in her position as a Technical Researcher, she was paid less than her replacement, Ben Ausdenmoore. She further alleges that, in her positions related to the EM-BAA, RaDiAEM and MOAST contracts, she was paid

8

less than RaDiAEM Program Managers John Taylor and David Snyder even though the work they all did was substantially equal.

### A.    Equal Pay Act Claim

The Equal Pay Act prohibits an employer from discriminating

> between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

29 U.S.C. § 206(d)(1).  Four affirmative defenses are set forth in the statute. Unequal wages are permissible if "made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."  *Id.*

To establish a prima facie case of sex discrimination under the EPA, a plaintiff must show that the employer paid higher wages to employees of the opposite sex for "substantially equal" work.  *Timmer v. Mich. Dep't of Commerce*, 104 F.3d 833, 843 (6th Cir. 1997).  Although the jobs need not be identical, there must be "substantial equality of skill, effort, responsibility and working conditions." *Harrison-Pepper v. Miami Univ.*, 246 F. Supp. 2d 854, 860 (S.D. Ohio 2003) (Beckwith, J.) (internal quotation omitted).

"Skill" encompasses "experience, training, education, and ability," and is "measured in terms of the performance requirements of the job."  29 C.F.R. § 1620.15(a). "Effort" encompasses "the measurement of the physical or mental

exertion needed for the performance of a job." 29 C.F.R. § 1620.16(a). "Responsibility" encompasses "the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." 29 C.F.R. § 1620.17(a). "Working conditions" concern factors such as surroundings and hazards. 29 C.F.R. § 1620.18(a).

If the plaintiff establishes a prima facie case, the burden shifts to the employer to show, by a preponderance of the evidence, that one of the affirmative defenses applies. *Timmer*, 104 F.3d at 843. Although the plaintiff "is not required to prove pretext, she still must come forward with evidence demonstrating the existence of a triable issue of fact." *Id.* at 844.

Here, it is undisputed that Ausdenmoore, Snyder and Taylor were paid more than Flannery. RRI, however, argues that, because the positions held by Flannery were not "substantially equal" to those of her alleged male comparators, she cannot establish a prima facie case under the EPA. RRI further argues that, even if Flannery could establish a prima facie case, any pay differential between her and her male comparators was due to a factor other than sex.

The Court finds that, based on the evidence presented, no reasonable jury could find that the positions held by Flannery were "substantially equal" to those of Ausdenmoore, Snyder or Taylor. Flannery therefore cannot establish a prima facie violation of the Equal Pay Act. The Court need not, and does not, reach the question of whether any pay differential between Flannery and her male comparators was due to a factor other than sex.

10

1.    **Technical Researcher**

Flannery first alleges that, as a Technical Researcher, Ben Ausdenmoore, who was hired to replace her in 2014, was paid more than she was for substantially equal work.[4]  Flannery testified that, in her job as a Technical Researcher, she did neuroscience research.  She performed literature reviews and wrote reports.  She conducted research in a clean room, and sometimes attended scientific conferences for business development purposes.  Doc. #21-2, PageID##174-75.

Flannery and Ausdenmoore both reported to Dr. Kapp, and performed many of the same kinds of duties.  RRI argues, however, that, based on the evidence presented, no reasonable jury could find that the work Flannery performed was substantially equal to that performed by Ausdenmoore in terms of skill.  Again, federal regulations define "skill" to include "experience, training, education, and ability."  29 C.F.R. § 1620.15.

RRI notes that Ausdenmoore had more education and relevant experience than Flannery did.  Whereas Flannery had only a Bachelor's degree in Psychology, Ausdenmoore had a Master's degree in Physiology and Neuroscience.  In addition,

---

[4]   Given that Flannery did not file her Complaint until December of 2018, there is some question as to whether the EPA claims involving Ausdenmoore as a comparator would be time-barred.  The EPA's statute of limitations is two years, but can be extended to three years if the violation is willful.  *See Logan v. MGM Grand Detroit Casino*, 939 F.3d 824, 830 (6th Cir. 2019); 29 U.S.C. § 255(a). Nevertheless, because RRI did not raise a statute-of-limitations defense in its Answer, the Court will consider it waived and address this portion of the claim on the merits.

Flannery had no experience doing scientific research, whereas Ausdenmoore had several years of experience in this field. *See* Doc. #21-4, Exh. 1.

The Sixth Circuit has cautioned, however, that, for purposes of establishing a prima facie case, it is "the *jobs* and not the *employees*" that must be compared. *EEOC v. City Council of Cleveland*, No. 88-3726, 1989 U.S. App. LEXIS 7281, at *13 (6th Cir. May 24, 1989). "Factors like education and experience are considered as a defense to an employer's liability rather than as part of a plaintiff's prima facie case." *Beck-Wilson v. Principi*, 441 F.3d 353, 363 (6th Cir. 2006). Therefore, at this stage of the "skill" analysis, the Court focuses on experience, training, education, and ability only as it relates to what skills were required for the Technical Researcher job.

According to Mary Barefoot, before Ausdenmoore was hired to replace Flannery, the Technical Researcher position was restructured based on new governmental requirements mandating that RRI hire someone with certain computer programming skills that Flannery simply did not possess. Doc. #21-1, PageID#141. As part of his job duties as a Technical Researcher, Ausdenmoore used his computer programming skills and, more specifically, his familiarity with the Matlab program, to perform coding simulations to assist in determining whether proposed solutions for various scientific problems could work outside the laboratory. *Id*. It is undisputed that Flannery had no computer programming skills and that coding was not part of her job as a Technical Researcher at RRI. Doc. #21-2, PageID#147.

12

In support of her claim, Flannery has submitted an Affidavit in which she states that, when Ausdenmoore was hired to replace her, "[t]here was no change in responsibility or requirements for that position.  To the extent that Ausdenmoore had coding skills, they were used minimally, if at all[,] on the project."  Doc. #29-1, PageID#625.

The Court agrees with RRI that it would be improper to consider Flannery's Affidavit, because it is not based on personal knowledge and it conflicts with her earlier deposition testimony.  At her deposition, Flannery admitted that she had no personal knowledge of what Dr. Kapp required of Ausdenmoore as a Technical Researcher.  She explained that, because Ausdenmoore had been hired to replace her, she assumed that he performed the same job duties she had.  She stated, "[h]e backfilled me.  So it *should have been* my job.  When I talked to them, it *seemed* like it was."  Doc. #21-6, PageID#251 (emphasis added).

Because Flannery's Affidavit conflicts with her earlier deposition testimony, it is insufficient to create a genuine issue of material fact as to whether she and Ausdenmoore performed substantially equal work in terms of the skill required for the job.  *See Aerel, SRL v. PCC Airfoils, LLC*, 448 F.3d 899, 906 (6th Cir. 2006) (holding that an affidavit that conflicts with earlier deposition testimony cannot be used to create a genuine issue of material fact).

Flannery has offered no admissible evidence to counter Mary Barefoot's testimony that Ausdenmoore's job as a Technical Researcher required computing programming and coding skills that Flannery simply did not have.  Under the

circumstances presented here, the mere fact that Flannery and Ausdenmoore held the same job title and reported to the same supervisor is not enough to establish a prima facie case under the Equal Pay Act. *See Beck-Wilson*, 441 F.3d at 362 (noting that, in assessing a claim under the EPA, "our focus is on actual job requirements and duties, rather than job classifications or titles.").

Accordingly, to the extent that Flannery's Equal Pay Act claim is based on the pay differential between her and Ausdenmoore with respect to the Technical Researcher position, the Court sustains RRI's motion for summary judgment on this portion of the claim.

### 2. Project Lead/Deputy Project Manager/Program Manager

Flannery next argues that, in her positions as a Program Manager on the EM-BAA and RaDiAEM contracts (from August of 2014 until late 2015), and the MOAST contract (from November of 2016 until she left RRI in July of 2018), she was paid less than RaDiAEM Program Managers John Taylor and David Snyder for work that was substantially equal in terms of skill, effort, responsibility and working conditions.[5]

---

[5]   In her memorandum in opposition to the motion for summary judgment, Flannery also argues that she was paid less than Mike Mattarock, who assumed her Program Manager duties on the MOAST contract after she left.  However, as RRI notes, Flannery did not identify Mattarock as a comparator prior to the close of discovery.  More importantly, no reasonable jury could find that their positions were substantially equal, given that Mattarock assumed Flannery's Program Manager duties on the MOAST contract *in addition to* his work as a System Architect on other contracts.  Doc. #31-5, PageID#740.

14

### a. Job Titles

As an initial matter, the Court must address the question of job titles. In her Affidavit, Flannery states that, from the time she first began managing government contracts in August of 2014, she "was always referred to as the Program Manager for these contracts." Doc. #29-1, PageID#624. She notes that the name plate outside her door and her business cards indicated that she was a Program Manager. *Id.*; Doc. #29-2, PageID#627. Moreover, no one at RRI ever challenged the signature block for her email, in which she identified herself as a Program Manager. Doc. #29-1, PageID#624.

Flannery has also submitted an Affidavit of Francisco Parada, the Wright-Patterson Air Force Base Government Program Manager on the RaDiAEM contract. He states that Flannery was RRI's initial Program Manager on the RaDiAEM contract, and that John Taylor and David Snyder later assumed her same role and responsibilities. Doc. #29-7, PageID#651.

Notes written by Elina Yakubov, RRI's HR Director, refer to Flannery as the "Program Manager" on the MOAST contract. Doc. #29-3, PageID#628. Flannery has also submitted Affidavits from RRI's Principal Investigators, Scott LaChance and Mark Buchanan, who praised her abilities as the "Program Manager" on the MOAST contract. Doc. #29-6; Doc. #29-8.

Despite all of this evidence, RRI maintains that Flannery was never a "Program Manager," but rather a "Project Manager." Barefoot explained that a "Project Lead," a/k/a "Project Manager," is generally responsible for the day-to-day

15

operational activities on a particular contract, whereas a "Program Manager" is fully responsible for the entire program, including business development and ensuring that the project is on schedule.  Doc. #21-5, PageID##232, 236. Flannery maintains that, prior to this lawsuit, she did not know that RRI had designated her as a Project Manager instead of a Program Manager.

It is evident that job titles are somewhat fluid at RRI.  For example, Mary Barefoot uses the terms "Project Lead" and "Project Manager" interchangeably, and notes that job titles within RRI changed over time.  Doc. #21-1, PageID#139; Doc. #21-5, PageID#239.  Likewise, Flannery testified that "titles mean very little at Riverside Research, and the work that you end up doing can vary."  Doc. #21-2, PageID#179.  She urges the Court to reject RRI's suggestion that she was paid less than Taylor and Snyder because she was classified as a "Project Manager" and they were "Program Managers."  She argues that, regardless of her job title, she "performed the same duties and tasks as Mr. Snyder and Mr. Taylor."  Doc. #29-1, PageID#625.

RRI has raised numerous challenges to the admissibility of the evidence presented by Flannery concerning her job title.  To the extent that these objections are relevant, they will be discussed below.  The Court notes, however, that a job title is not determinative.  As the Sixth Circuit has explained, "[r]esolution of a claim under the Equal Pay Act depends not on job titles or classifications but on actual job requirements and performance." *Conti v. Universal Enters.*, *Inc.*, 50 F. App'x 690, 696 (6th Cir. 2002).  *See also Beck-Wilson*, 441 F.3d at 362 (same).

16

Regardless of Flannery's job title, the key question is whether she can prove that her job was "substantially equal" to that of David Snyder or John Taylor in terms of skill, effort, responsibility and working conditions.  As explained below, the Court finds that Flannery is unable to do so.

### b.  EM-BAA and RaDiAEM Contracts

Flannery's first experience managing government contracts was when she was designated as the Project Lead on the EM-BAA contract in August of 2014. Although Flannery's Affidavit states that she was always referred to as the "Program Manager," Doc. #29-1, PageID#624, this is directly contradicted by her earlier deposition testimony in which she agreed that she was the "Project Lead" on the EM-BAA contract.  Doc. #21-1, PageID#177.  When Flannery took this position, the EM-BAA contract was winding down and had only about $800,000 remaining.  Doc. #31-4, PageID#727.

According to Mary Barefoot, Terry Gnau was the Program Manager on the EM-BAA contract.  Doc. #21-1, PageID##139-40.  Flannery's duties as the Project Lead were limited to assisting Gnau with completing the EM-BAA contract.  She never had full responsibility for it.  Instead, she helped Gnau with budgeting, planning and scheduling, and was a secondary contact for project statuses, timelines and risks.  *Id.*; Doc. #21-3, PageID#217.  Flannery has presented no evidence to the contrary with respect to her job duties on the EM-BAA contract.

After the EM-BAA contract merged into the RaDiAEM contract, Flannery became the Deputy Project Manager.[6]  She testified that this title carried additional responsibilities, Doc. #21-2, PageID#179, but makes no effort to identify what those entailed.  In fact, in an email to Terry Gnau, she stated that her "job duties [on the RaDiAEM contract] *remained the same* as when I was managing the [EM-]BAA."  Doc. #29-10, PageID#657 (emphasis added).  Flannery now argues, however, that her job duties on the RaDiAEM contract were substantially equal to those of John Taylor and David Snyder, who were hired as the Program Managers on the RaDiAEM contract.

Francisco Parada stated that Flannery was the "Program Manager" for the RaDiAEM contract before she was replaced in 2015 by John Taylor and then David Snyder who "took over" her "role and responsibilities" and "occupied the same office."  Doc. #29-7, PageID#651.  According to Parada, Flannery was responsible for executing the contract, and had responsibility for "cost, schedule and performance," and for "the capture of additional research opportunities beyond those identified in the contract."  *Id.*  Flannery also helped to acclimate Taylor to the position when he was hired.  *Id.*

---

[6]   Again, to the extent that Flannery's Affidavit states that she was referred to as the "Program Manager," this is directly contradicted by her earlier deposition testimony in which she agreed that she was the "Deputy Project Manager" on the RaDiAEM contract.  Doc. #21-1, PageID##179, 181.  *See also* Doc. #29-10, PageID#657 (referring to herself as a "Deputy PM" on the RaDiAEM contract).

Before John Taylor was hired as the Program Manager, Flannery may well have been Parada's principal contact person at RRI concerning issues of contract cost, scheduling and performance. These duties would have been consistent with her position as a Deputy Project Manager. However, given Flannery's business cards and email signature block identifying herself as a "Program Manager," Parada may well have believed that Flannery was, in fact, the "Program Manager" for the RaDiAEM contract.

In light of Flannery's own deposition testimony and other evidence of record, Parada's Affidavit is insufficient to create a genuine issue of material fact as to whether Flannery's position was substantially equal to the Program Manager position later held by Taylor and then Snyder in terms of skill, effort or responsibility. Not only did Flannery admit that she was only the "Deputy Project Manager" on the RaDiAEM contract, but she also admitted that John Taylor, and later David Snyder, were hired as the Program Managers for that contract. She candidly admitted that she never held the role of Program Manager. She also admitted that Taylor and Snyder were fully responsible for the management of the RaDiAEM contract, and that she was not. Doc. #21-1, PageID##181-82.

With respect to skill, RRI notes that Taylor had 20 years of experience in government contracting; Snyder had 18. Both were certified Program Management Professionals ("PMP"). See Doc. #30, PageID##664-670; Doc. #31-5, PageID#741. In contrast, Flannery had no experience managing government

contracts prior to her work on the EM-BAA contract, and was not a certified PMP. Doc. #21-2, PageID#178.[7]

Here, the prior experience of Taylor and Snyder is relevant to the skills required for the Program Manager position on the RaDiAEM contract.  Terry Gnau stated in his Declaration that "RaDiAEM was a contract with multiple, simultaneous task orders and approximately 14 employees and I believe dozens of subcontractors.  It was a large contract with a total value to RRI of over 40 million dollars."  Doc. #21-3, PageID##218-19.  Taylor and Snyder were hired, in part, because they had extensive experience managing large government contracts and would need very little oversight or assistance. *Id.*

Moreover, the RaDiAEM Program Manager role required much greater effort than the position held by Flannery.  She testified that she served as the Deputy Project Manager on the RaDiAEM contract with the intention of some day moving into the Project Manager role.  Doc. #21-2, PageID#181.  However, when the time came, she opted instead to move into a business development role so that she could spend more time with her family.  *Id.*  She explained that "running the RaDiAEM contract is a full-time very stressful job, [and] sometimes goes outside of business hours."  *Id.* at PageID##184-85.

The RaDiAEM Program Manager also entailed much more responsibility than the position held by Flannery.  Although Flannery may have helped train Taylor

---

[7]  Flannery admitted at her deposition that she was not familiar with the prior work experience of either Taylor or Snyder.  Doc. #21-2, PageID##186-87.

when he was hired, and may have performed some tasks that overlapped with his, Taylor and Snyder had much more responsibility than she did.   As previously noted, she admitted that Taylor and Snyder were fully responsible for the long-term success of the RaDiAEM contract, and that she was not.

Based on the foregoing, no reasonable jury could find that Flannery's positions on either the EM-BAA or RaDiAEM contracts were substantially equal to the RaDiAEM Program Manager positions held by Snyder and Taylor.  RRI is therefore entitled to summary judgment on this portion of Flannery's Equal Pay Act claim.

### c. MOAST Contract

Finally, Flannery seeks to compare her role as the Program Manager on the MOAST contract with the role of Taylor and Snyder as the Program Managers on the RaDiAEM contract.[8]  She again argues that she was paid far less than they were for substantially equal work.  Again, RRI argues that, based on the evidence presented, no reasonable jury could find that the work performed by Flannery on the MOAST contract was substantially equal to the work performed by Taylor or Snyder on the RaDiAEM contract.

---

[8]   Flannery has submitted Affidavits of Scott LaChance and Mark Buchanan, two of her Principal Investigators on the MOAST contract.  They each refer to her as the "Program Manager."  Doc. #29-6, PageID#648; Doc. #29-8, PageID#655. Again, RRI maintains that Flannery's job title on the MOAST contract was "Project Manager."  However, as explained above, job titles are not dispositive.  The key question is whether the jobs are substantially equal in terms of skill, effort, responsibility and working conditions.

Flannery testified that, on the MOAST contract, she was the liaison between the project team and management. She reviewed the status of projects and budgets, managed schedules, prepared status reports, and problem solved to meet productivity, quality and client satisfaction goals and objectives. She was responsible for profit and loss and had business development responsibilities. She was also accountable to oversee the results of multifunctional teams. Doc. #21-2, PageID##145-46.

Certainly, some of these job duties overlapped with some job duties performed by Taylor and Snyder on the RaDiAEM contract. Nevertheless, the Court agrees with RRI that, based on the evidence presented, no reasonable jury could find that Flannery's job was substantially similar to Taylor's or Snyder's in terms of effort or responsibility.

In terms of *effort*, the Court notes that managing the MOAST contract was Flannery's only responsibility. However, when Flannery left RRI, her responsibilities on the MOAST contract were assumed by Terry Gnau, who was also managing other contracts, and then by Mike Mattarock, who managed the MOAST contract in addition to his regular duties as a System Architect on other programs. Doc. #31-5, PageID#740. [9] In light of the foregoing, it can reasonably

---

[9] RRI argues that there was even some discussion about reducing Flannery's Project Manager job on the MOAST contract to a part-time position. However, the cited portions of her deposition transcript were not provided to the Court. Therefore, the Court will not consider this argument.

be inferred that the effort required to manage the MOAST contract was less than that required to manage the RaDiAEM contract. As previously noted, Flannery testified that running the RaDiAEM contract would be a "very stressful" job, requiring work outside of normal business hours. Doc. #21-2, PageID##184-85. Accordingly, no reasonable jury could find that Flannery's position on the MOAST contract was substantially equal to Taylor's or Snyder's positions on the RaDiAEM contract in terms of effort.

Likewise, it cannot be said that Flannery's position on the MOAST contract was substantially equal to Taylor's and Snyder's positions on the RaDiAEM contract in terms of *responsibility*. The RaDiAEM contract was valued at over $40 million, and had multiple, simultaneous task orders, the first two of which were worth $5 million each. Doc. #21-3, PageID#219; Doc. #21-1, PageID#140. In contrast, the MOAST contract involved a single task order worth just $3.9 million, with the possibility of additional task orders based on performance. Doc. #21-1, PageID#140. In addition, whereas Taylor and Snyder supervised 14 employees and dozens of subcontractors on the RaDiAEM contract, Doc. #21-3, PageID#218, Flannery supervised, at most, 6 employees and 4 subcontractors on the MOAST contract. *Id.* at PageID#219. RRI further notes that Snyder's revenue target for 2017 was $7.41 million, *id.*, whereas Flannery's was only $2.353 million. *See* Doc. #21-2, PageID#214.

For these reasons, summary judgment is also warranted on this portion of Flannery's EPA claim.

23

To summarize, the Court finds that, based on the evidence presented, Flannery cannot establish a prima facie violation of the Equal Pay Act, given that her positions on the EM-BAA, RaDiAEM and MOAST contracts were not substantially similar to the Program Manager role held by Taylor and Snyder on the RaDiAEM contract in terms of skill, effort or responsibility. Accordingly, the Court SUSTAINS RRI's Motion for Summary Judgment, Doc. #21, on the EPA claim and DISMISSES that claim WITH PREJUDICE.

### B. State Sex Discrimination Claim/Constructive Discharge

In Count II of the Complaint, Flannery alleges sex discrimination in violation of Ohio Revised Code §§4112.02 and 4112.99, along with constructive discharge. Given that the Court has dismissed her only federal claim, it declines to exercise supplemental jurisdiction over her state law claim. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (holding that if federal claims are dismissed before trial, the state claims should be dismissed as well); 28 U.S.C. §1367(c)(3) (providing that district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction). Accordingly, Count II of the Complaint is DISMISSED WITHOUT PREJUDICE.

### IV. Conclusion

For the reasons set forth above, the Court SUSTAINS Defendant Riverside Research Institute's Motion for Summary Judgment, Doc. #21. Finding no genuine issue of material fact, the Court DISMISSES Count I, the Equal Pay Act claim,

WITH PREJUDICE.  The Court declines to exercise supplemental jurisdiction over

Count II, the state law claim of sex discrimination/constructive discharge, and

DISMISSES this claim WITHOUT PREJUDICE.

Judgment shall be entered in favor of Defendant and against Plaintiff.

The captioned case is hereby ordered terminated upon the docket records of

the United States District Court for the Southern District of Ohio, Western Division,

at Dayton.


Date: March 30, 2021                    _Walter H. Rice_ (tp - per Judge Rice authorization after his review)
                                        WALTER H. RICE
                                        UNITED STATES DISTRICT JUDGE